B. EARLE APPLETON & others vs. MASSACHUSETTS PARKING AUTHORITY & another.

Suffolk.    December 10, 1959. — February 1, 1960.

Present: WILKINS, C.J., SPALDING, COUNIHAN, WHITTEMORE, & CUTTER, JJ.

*Massachusetts Parking Authority. Boston Common. Eminent Domain,* Authority for taking. *Statute,* Construction.

The specific provisions of St. 1958, c. 606, §§ 5 (i) and 7, authorizing acquisition of interests in Boston Common and other named areas by the Massachusetts Parking Authority by conveyance from the city of Boston subject to assent by the city's parks and recreation commission and authorization by the city council do not preclude acquisition of interests in a proper part of Boston Common by the Authority for its purposes by exercise of the general power of eminent domain respecting parks and other public lands conferred upon the Authority by § 5 (k).

PETITION filed in the Superior Court on August 14, 1959.

The case was reported by *Lurie,* J.

*Richard Wait,* for the petitioners.

*William H. Kerr,* for the respondent city of Boston.

*John F. Ferrick,* for the respondent Massachusetts Parking Authority.

WILKINS, C.J.    This petition for a writ of mandamus, which attacks the validity of two orders of taking by eminent domain of portions of Boston Common for the purpose of constructing an underground garage, has been reported without decision by a justice of the Superior Court upon what is in effect a case stated.    G. L. c. 231, § 111.    The

petitioners are fourteen residents of the Commonwealth. The respondents are Massachusetts Parking Authority created by St. 1958, c. 606, and the city of Boston. In their answer they ask declaratory relief under G. L. c. 231A, § 6.

On July 30, 1959, the city was the owner of a tract of approximately forty-eight acres, known as the Boston Common, and held title in fee subject to an easement in favor of the general public for use as a public park. *Lowell* v. *Boston,* 322 Mass. 709, 731, 741. Statute 1958, c. 606, is entitled "An Act providing for the construction, maintenance, repair, operation or leasing of a garage for the parking of motor vehicles under Boston Common in the city of Boston and creating the Massachusetts Parking Authority, defining its powers and duties, and providing for the financing of such garage." The Authority is made "a body politic and corporate," and is "constituted a public instrumentality and the exercise by the Authority of the powers conferred by this act in the construction, operation and maintenance of the garage shall be deemed and held to be the performance of an essential governmental function" (§ 3). The Authority consists of three unpaid members, two appointed by the Governor with the advice and consent of the council, and the third an officer of the city to be designated from time to time by the mayor.

The present controversy arises from what the petitioners argue is a limitation upon § 5 (k), contained in §§ 5 (i) and 7. Section 5 (k) empowers the Authority "To acquire in the name of the Authority by purchase or otherwise, on such terms and conditions and in such manner as it may deem proper, or by the exercise of the power of eminent domain in accordance with the provisions of chapter seventy-nine of the General Laws or any alternative method now or hereafter provided by law insofar as such provisions may be applicable, such public lands, parks, playgrounds, reservations, highways or parkways, or parts thereof or rights therein, and any fee simple absolute or any lesser interest in such private property as it may deem necessary for carrying out the provisions of this act, which taking or purchase

may be fixed by planes of division, or otherwise, below or above or at the surface of the soil, with no taking of upper or lower portions; provided, that no compensation shall be paid for public lands taken . . . ."

Section 5 (i) authorizes the Authority "To acquire by conveyance under section seven of this act, and hold such interest in and under the lands constituting Boston Common and in Commonwealth avenue, Arlington street, the Public Garden, Charles street and any other public street as it may deem necessary for carrying out the provisions of this act . . . ." Section 7 provides: "Notwithstanding any contrary provision of general or special law, the city of Boston, by its mayor shall convey to the Authority, without consideration, such interest in the lands constituting Boston Common and in Commonwealth avenue, Arlington street, the Public Garden, Charles street and any other public street as the Authority may deem necessary for carrying out the provisions of this act; provided, that the parks and recreation commission of the city shall, by vote at a regular or special meeting of said commission, assent to such conveyance; and provided, further, that such conveyance is authorized, after two separate readings, by two separate votes of the city council of the city, the second of said readings and votes to be had not less than fourteen days after the first."

The first order was for "the taking of the right and easement to enter upon, excavate, move, change, restore and do any and all things necessary in the construction, reconstruction, extension, improvement, maintenance, repair, operation or leasing of a garage for the parking of motor vehicles, exclusive of trees and structures upon or affixed thereto, in and to" a portion of Boston Common described by metes and bounds and within the area authorized in St. 1958, c. 606, § 2 (e).[1]  The second order was for "the taking in fee,

---

[1] "'Garage' shall mean a garage for motor vehicles under Boston Common in the city within the following boundaries: Bounded westerly by the easterly line of Charles street; northerly by the southerly line of Beacon street; easterly by the Soldiers and Sailors Monument and the westerly perimeter of the Parkman bandstand; southerly by the Central Burying Ground, together with all necessary and convenient approaches above and below ground . . . ."

exclusive of trees and structures therein and thereon all land belonging to the City of Boston lying two feet and more below the present surface of Boston Common as delineated" on a plan there referred to within the same area described in the first order. Both orders were duly recorded in the Suffolk County Registry of Deeds on July 30, 1959. Previous to that date the Authority had made application to the appropriate officials of the city to obtain a conveyance of that portion of Boston Common which was deemed necessary for the construction of the garage. While the city council and the parks and recreation commission were severally considering the application but had not voted their respective authorization and assent, the Authority withdrew the application. The city recognizes the Authority as owning and having the right to exercise and use the interest allegedly taken, even though no conveyance has been made under St. 1958, c. 606, § 7.

An analysis of the quoted sections of the statute shows that the first numerically, § 5 (i), which is expressly coupled with § 7, authorizes the acquisition by conveyance of land within a definitely described area, which constitutes the Boston Common, the Public Garden, three named streets, "and any other public street" deemed necessary for carrying out the act. The named streets are Charles Street, which divides the Common from the Garden; Arlington Street, which bounds the Garden on the opposite side from the Common; and Commonwealth Avenue, which is perpendicular to Arlington Street, and with the Garden is in prolongation of the area which is specifically described.[1] Section 5 (i) is followed by a general provision in § 5 (k) permitting acquisition by purchase or otherwise or by exercise of the power of eminent domain of land anywhere, public or private, deemed "necessary for carrying out the provisions of this act." The provision in § 7 as to conveyance by the city prescribes certain preliminary steps: (1) assent

---

[1] There is also to be "a two-lane traffic tunnel to be constructed under the provisions of this act under the Public Garden, Charles street and Boston Common from Commonwealth avenue at or near Arlington street to the garage . . . ." § 2 (h).

by the parks and recreation commission, and (2) two votes by the city council.

The underlying question is whether the Legislature intended to confer upon the city the right in any event to hold up the construction of the garage. In previous legislation on this subject, the city was given such power. St. 1946, c. 294, §2. St. 1957, c. 701, §§ 3 (d), 4. See St. 1955, c. 529, § 1. In other words, §§ 5 (i) and 7 are not new in the development of the under common garage legislation, and are similar to two sections in the next preceding statute. St. 1957, c. 701, §§ 3(d), 4. Section 5 (k), on the other hand, is making its first appearance in this garage legislation, although it is not original in c. 606, but is found in earlier statutes with respect to other projects.[1] We are unable to give any decisive effect to this fact.

Against a construction conferring upon the city what would be, in effect, a veto power, the respondents stress the statutory history of St. 1958, c. 606. We are reminded that "The Legislature has repeatedly recognized that in the city of Boston there exists a parking nuisance which is not capable of being adequately abated except by the construction and operation of a garage under Boston Common." See St. 1946, c. 294, § 1; St. 1957, c. 701, § 1; St. 1958, c. 606, § 1. By St. 1946, c. 294, the Legislature authorized the city to enter into a contract with a private corporation for the construction and operation of such a garage at the expense of the corporation and without cost to the city. In aid of c. 294, amendments were enacted. St. 1948, c. 654. St. 1951, c. 355. St. 1955, c. 529. When no garage was erected by private enterprise, there was enacted St. 1957, c. 701, which provided for the creation of Boston Common Garage Authority upon acceptance of the act by vote of the city council approved by the mayor. That act not being accepted, the act now before us was passed and the earlier acts repealed. St. 1958, c. 606, § 23. In § 1 of St. 1958, c.

---

[1] St. 1946, c. 562, § 5 (f) (Mystic River Bridge Authority). St. 1952, c. 354, § 5 (k) (Massachusetts Turnpike Authority). St. 1958, c. 598, § 5 (f) (additional tunnel between Boston and East Boston).

606, it is "declared that the free circulation of traffic of all kinds through the streets of the city of Boston is necessary . . . for the health, safety and general welfare of the public, whether residing in said city or traveling to, through or from said city in the course of lawful pursuits; that in recent years the parking of motor vehicles in the streets of said city has so substantially impeded such free circulation of traffic as to constitute at the present time a public nuisance endangering the health, safety and welfare of the general public, as well as endangering the economic life of said city; that this parking nuisance is not capable of being adequately abated except by the construction and operation of a garage under Boston Common . . . and a public exigency exists which makes the provisions of this act a public necessity." Again in § 16 it is stated, "The exercise of the powers granted by this act will be in all respects for the benefit of the people of the commonwealth, for the increase of their commerce and prosperity, and for the improvement of their health and living conditions . . . ." In § 20 we read, "This act, being necessary for the welfare of the commonwealth and its inhabitants, shall be liberally construed to effect the purposes thereof."

In favor of the construction that a veto power has been conferred upon the city, the petitioners point out that the general theory of the statute is to set up the Authority as a new agency to finance, construct, and operate the garage while the revenue bonds financing it are outstanding, after which the garage "shall become the property of the city." (§ 15). After casting doubt upon the efficacy of the last quoted phrase, the petitioners lay emphasis upon the reasonableness of the inclusion in a conveyance of some provision concerning the city's rights under § 15. They contend, and we agree, that the statute contemplates that the Authority shall have no more than a base fee, whereas the second of the takings purports to be of an unqualified fee. It is also strongly argued that there is nowhere a provision, which might prudently have been included in a conveyance, that construction of the project should commence within a

stated time; and that if it never should commence, and the takings are good, title would pass from the city, which has both the power and obligation to maintain the Common as a park, to the Authority, which has neither.

The petitioners' main argument is based upon a rule of statutory construction, "where a statute includes both a particular and also a general enactment, which in its most comprehensive sense would include what is embraced in the particular one, the particular enactment must be given effect, and the general enactment must be taken to embrace only such cases within its general language as are not within the provisions of the particular enactment." Black, Interpretation of Laws (2d ed.), p. 201. As applied to c. 606, the contention is that the particular enactment contained in §§ 5 (i) and 7 is full and complete, and that the general eminent domain provision in § 5 (k) cannot apply to the area which is the subject matter of §§ 5 (i) and 7.

Each party insists that the construction each respectively favors is the one which is reasonable and in consonance with harmony and common sense. The statute, which is of great importance, is not expressed with a clarity commensurate with that importance. It is regrettable that there is no express statement coördinating § 5 (k) and §§ 5 (i) and 7. We deplore that a more careful provision as to the reversion of the project to the city is not to be found in § 15 or elsewhere. Nevertheless the duty is ours to discover the legislative intent. Giving due weight to the history of this legislation and to the strong and repeated declarations as to public necessity, we are of opinion that the introduction of § 5 (k), expressed in such very broad terms, must be taken as a manifestation that the Legislature intended that the city no longer should have a veto power over the commencement of this long delayed project. In this view, § 5 (k) and §§ 5 (i) and 7 are concurrent methods of transferring title. This construction, which we concede is not completely satisfactory, does not render §§ 5 (i) and 7 completely nugatory. It would have applied had the alternate method of transferring title by conveyance of the city been adopted.

We do not regard § 5 (k) as a roving eminent domain provision which could be used to take as yet unspecified substantial portions of the Common and the Public Garden. The areas in which the garage and the tunnel from Commonwealth Avenue are authorized to be built are definitely delineated by § 2 (e) and (h). Doubtless approaches, which are not provided for in the two takings, will have to be taken. These must be reasonable approaches, and it will be time enough to pass upon their propriety if question respecting them arises.

In response to the prayers in the answer, declaration is to be made that the two orders of taking of interests in Boston Common are valid, and that the respondent Authority is the owner of the right and easement, and of the fee, respectively described in such orders, subject to the right of reversion to the city as provided in St. 1958, c. 606, § 15. The petition is to be dismissed.

*So ordered.*